*Noah Shane Riley v. State of Maryland*, No. 1568, September Term, 2023.  Opinion by Graeff, J.

**FOURTH AMENDMENT — REASONABLE SUSPICION — *WHREN* STOP — MARYLAND DECLARATION OF RIGHTS — PROBABLE CAUSE — STATUTORY INTERPRETATION — RETROACTIVITY — FIFTH AMENDMENT — MIRANDA**

Traffic stop for crossing the "gore area," a traffic control device, was reasonable under the Fourth Amendment.  Even if the stop was pretextual, it was permitted under the Fourth Amendment, and the Supreme Court of Maryland has consistently construed Article 26 of the Maryland Declaration of Rights *in pari materia* with the Fourth Amendment.  Moreover, even if there was a reason to depart from the well-established practice of construing Article 26 consistent with the Fourth Amendment, appellant would not be entitled to relief because Maryland courts have not recognized an exclusionary rule under the state constitution for the suppression of evidence obtained in violation of Article 26.

The circuit court did not err in denying appellant's motion to suppress evidence found during a vehicle search based on the detection of cannabis odor.  The search occurred prior to the effective date of Md. Ann. Code, Crim. Proc. ("CP") § 1-211(c) (2024 Supp.), which prohibited the search of a vehicle based solely on the odor of cannabis.  Accordingly, the evidence was not discovered in violation of the statute, and appellant was not entitled to exclusion of the evidence.

The court erred in denying the motion to suppress appellant's statement that the gun found in his car was his gun.  Although a *Terry* stop generally does not amount to custody for purposes of *Miranda*, after the initial stop here, appellant was subjected to treatment that rendered him in custody.  The trooper ordered the other officers to "cuff" appellant and his passengers after finding a gun in a backpack behind the driver's seat in a vehicle appellant had been driving.  Under the totality of the circumstances, appellant was "in custody" for purposes of *Miranda* when he stated the gun was his.  Accordingly, because the officer did not give appellant *Miranda* warnings before he asked "whose gun," the court erred in denying appellant's motion to suppress this statement.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1568

September Term, 2023

_____

NOAH SHANE RILEY

v.

STATE OF MARYLAND

_____

Graeff,
Albright,
Woodward, Patrick L.
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Graeff, J.

_____

Filed: August 27, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Noah Shane Riley, appellant, was charged in the Circuit Court for Montgomery County with transporting a handgun in a vehicle and possession of a detached magazine with more than ten rounds. Appellant subsequently filed several motions to suppress. After a hearing, the court denied appellant's motion to suppress the evidence discovered in a search of his vehicle, and it granted in part, and denied in part, his motion to suppress statements he made after the traffic stop.

Appellant subsequently entered a conditional guilty plea to the charge of transporting a handgun in a vehicle. The court sentenced him to two years of incarceration, all but five days suspended, with five years of supervised probation.

On appeal, appellant presents the following questions for this Court's review, which we have rephrased slightly, as follows:

1. Did the circuit court err in denying appellant's motion to suppress evidence discovered in a warrantless search of appellant's vehicle?

2. Did the circuit court err in denying the motion to suppress un-*Mirandized* statements made by appellant?

For the reasons set forth below, we shall reverse the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 19, 2023, appellant filed several motions to suppress, asserting that the weapon and drugs obtained from the vehicle search were the fruits of an unlawful stop and search, and admissions appellant made after the search were custodial statements made in violation of *Miranda*.[1] The Court held a suppression hearing on July 27, 2023.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

# I.

**Testimony of Trooper Yarbrough and body camera footage**

Trooper T.C. Yarbrough, a member of the Maryland State Police, testified that, on September 14, 2022, he was assigned to a traffic barrack that patrolled Interstates 270 and 495 for accidents, driving violations, disabled vehicles, and debris in the roadway. His barrack conducted proactive enforcement where troopers went out to "just try to find traffic violations where they occur." That day, he was on a "foot stopping" team on Interstate 495 near Maryland Route 355. He explained that foot stopping involved officers getting out of their vehicles when traffic is slow and waving over to the shoulder cars that are committing traffic violations. They stop cars that cross the "gore area," an area with lines in between two solid white lines, which drivers are not supposed to cross.[2] The gore area is considered a traffic control device, and crossing it is a traffic violation.

Trooper Yarbrough observed appellant cross over the gore area, and he "flagged him over to the shoulder to stop him." Trooper Yarbrough explained the reason for the stop, asked appellant for his license and registration, and told him to "hang tight" so he could get him "out of here." He testified that he smelled a "strong odor of marijuana coming out of the vehicle."

Trooper Yarbrough went back to his vehicle to check the documents given to him by appellant and another person stopped for the same traffic violation. He messaged his

---

[2] A "gore area" is "a triangular plot of land as designated when a road forks at the intersection with [a] second road, or merges on and off from a larger one." *Gore (road)*, Wikipedia, available at: https://perma.cc/BYNC-9PNH (last visited August 26, 2025).

shift partner that they would be conducting a "probable cause search" of appellant's vehicle.[3]  Trooper Yarbrough returned documents to the other driver stopped and issued that driver a warning.  Trooper Yarbrough's body-worn camera video was admitted into evidence and played for the court.  It shows, consistent with Trooper Yarbrough's testimony, that, he then returned to appellant's vehicle, and told appellant that he smelled marijuana and would be searching the car.  He asked the three individuals in appellant's vehicle to step out of the vehicle, searched the vehicle, and discovered a handgun and marijuana in a backpack located on the floorboard behind the driver's seat.

Trooper Yarbrough testified that, after confirming that the handgun was not loaded, he placed it back in the backpack and told the three occupants of the vehicle that the troopers "were going to handcuff them for safety purposes just to figure out whose gun it was."[4]  Trooper Yarbrough testified that the occupants were "put in cuffs for safety," and he detained everyone because he was unsure if there were other weapons in the vehicle, and the men "could easily get to the car if they have to."  After Trooper Yarbrough told the

---

[3] As discussed in more detail, *infra*, the September 14, 2022 stop occurred prior to the effective date of the new law, Md. Code Ann., Crim. Proc. ("CP") § 1-211 (2024 Supp.), which prohibits law enforcement from searching a motor vehicle based solely on "the odor of burnt or unburnt cannabis," and provides that any evidence discovered or obtained "in violation" of that section is inadmissible in a court proceeding.

[4] The video shows three troopers at the scene at the time of the search, but only Trooper Yarbrough speaking with appellant.  The video does not reflect that, when Trooper Yarbrough told the other officers to handcuff the occupants, he told them that it was for safety purposes.

3

other officers to cuff the occupants, he asked "Whose gun?" and appellant immediately responded, prior to being handcuffed: "It's mine, it's mine, it's mine."

On cross-examination, Trooper Yarbrough testified that, when he pulled appellant over, he did not hear any honking or see any other vehicles swerving, and there was no collision or near collision. He could not see if anyone "hit their brakes" because his view was blocked by incoming traffic, and he was in front of the vehicles, not behind them. He confirmed that, at that time of day, "traffic is very backed up and people are . . . squeezing in to merge between cars . . . because there [are] no big open spaces." Traffic was slow, going approximately five miles an hour. When asked to describe "proactive enforcement," Trooper Yarbrough agreed that it could be described as "trying to find violations in search of a larger goal" because sometimes, when conducting the stops, they would "find something else."

After Trooper Yarbrough detected the odor of marijuana in appellant's vehicle, he decided to "do a probable cause search of the vehicle," and he had appellant pull his vehicle in front of the police cruisers at the scene. Trooper Yarbrough conducted a pat-down of appellant, and Trooper Canales patted down the other two vehicle occupants to check for weapons. Trooper Yarbrough stated that, any time he searched a vehicle, he patted down the occupants for officer safety purposes.[5] The pat-down did not disclose any weapons. Trooper Yarbrough then searched the vehicle.

---

[5] We note that a pat-down for weapons, a frisk, is appropriate only when the police have reasonable suspicion to believe an individual is armed and dangerous. *See State v. Smith*, 265 Md. App. 91, 103 (2025). In this case, however, nothing was found as a result of the pat-down, and the propriety of the pat-down has not been raised as an issue on appeal.

Appellant and the two passengers stood by a wall with Troopers Canales and Sauerfield during the search. Appellant was "compliant," and it was "clear . . . the three of them [we]re not going to go anywhere." After Trooper Yarbrough discovered the gun in the backpack, he walked toward appellant and the two passengers and instructed Troopers Canales and Sauerfield to "cuff them." As the troopers moved toward the men to cuff them, Trooper Yarbrough asked who the gun belonged to, and appellant admitted that it was his gun. As the handcuffs were put on appellant, Trooper Yarbrough asked appellant additional questions, including whether the backpack also belonged to him and whether the gun was registered. He also asked appellant about marijuana in the backpack, the absence of a "VIN on the weapon,"[6] and where he got the car rental and weapon. Appellant did not answer every question, but "he answered a number of them."

## II.

### Arguments of Counsel

The State argued that Trooper Yarbrough lawfully stopped appellant's vehicle because he had reasonable articulable suspicion that appellant committed a traffic violation by crossing over the gore area from a turn-only lane to the travel lane. In doing so, appellant failed to comply with the traffic control device, the lane markings. With regard to the vehicle search, the State argued that the officer had probable cause to search based on the odor of marijuana. Although the legislature had passed a new law disallowing

---

[6] Trooper Yarbrough testified that there was no "VIN on the weapon." A VIN is a vehicle identification number. *See State v. Paynter*, 234 Md. App. 252, 273 (2017). Trooper Yarbrough likely meant serial number, which is used to identify firearms. *See Graham v. State*, 151 Md. App. 466, 486 (2003).

5

vehicle searches based solely on the odor of marijuana, that law was not in effect at the time of the search, and therefore, it did not apply to this case. With respect to appellant's statements, the State argued that *Miranda* did not apply to a traffic stop. Although the police handcuffed appellant, that did not make the *Terry* stop "akin to [an] arrest" where the handcuffs were used for officer safety. Accordingly, the State argued that *Miranda* did not require the exclusion of appellant's statements.

Appellant's counsel first addressed the search of the vehicle. She agreed that CP § 1-211 was not the law at the time of the search, but she relied on her written motion, which stated that a bill that had passed both chambers of the Maryland legislature and was awaiting signature by the Governor prohibited a search of a vehicle based solely on the smell of marijuana.

With respect to the initial stop, counsel stated that Trooper Yarbrough admitted that the stop was pretextual, and she asked the court to find that pretextual stops were a violation of the Maryland Declaration of Rights. Counsel further questioned whether Trooper Yarbrough saw appellant cross the gore area, and even if he did, she argued that the traffic stop was not lawful because there was no evidence of a safety concern.

On the issue of *Miranda*, counsel argued that Trooper Yarbrough had no safety reason to handcuff the occupants of the vehicle because they had already been patted down before they were handcuffed, they were "completely compliant," and they were surrounded by two other troopers. Counsel asserted that the moment the vehicle occupants were ordered over to the wall with Troopers Canales and Sauerfield, they were "not free to leave," and once cuffed, they were "under arrest."

6

## III.

## Court's Ruling

The court first addressed whether the traffic stop was unlawful because it was a pretextual stop. It found, as a factual matter, that the stop was not pretextual because the troopers were stopping drivers who were "cutting across a very wide space," which was "somewhat dangerous." The court then stated that, even if the stop was pretextual, it did not believe "Maryland courts necessarily would find that the Supreme Court's handling of the issue of pretextual stops under the Fourth Amendment would be significantly different from what Maryland would rule under the Maryland Declaration of Rights," and it was an issue "that should be brought up by the appellate courts." It concluded that there was probable cause for the traffic stop because crossing the gore area was a violation of Maryland Vehicle Law.

With respect to the search of the vehicle, the court stated that, "on the date of the stop in this case, the law was such that the search of the vehicle based upon [the] mere odor of marijuana was sufficient." It found that the search of the backpack in the vehicle was permissible under the Fourth Amendment.

The court next addressed the "closest issue," whether appellant was in custody for purposes of *Miranda*. It stated that Trooper Yarbrough's question, "whose gun is it?", clearly was an interrogation, and the issue to decide was whether appellant was in custody.[7] The court discussed several cases that found that handcuffing was "justifiable as both a

---

[7] During the motions hearing, the judge stated that "the question for me" was whether, when Trooper Yarbrough said "cuff him," appellant was under arrest.

7

protective and a flight preventative measure pursuant to a lawful stop," and in those circumstances, it did not transform the stop into an arrest. The court concluded that Trooper Yarbrough asked the other officer to cuff appellant and his passengers "for safety reasons and . . . potentially flight reasons and . . . asked questions to delineate who should be arrested under the circumstances." The court ruled that appellant's statement that the gun belonged to him was admissible. At the time he stated that the gun belonged to him, however, "he would understand that he is in custody." Accordingly, the court granted the motion to suppress the statements appellant made after he said that the gun was his.

This appeal followed.

## STANDARD OF REVIEW

We have described the applicable standard of review for a motion to suppress as follows:

> When reviewing a circuit court's denial of a motion to suppress evidence, we are "limited to the record developed at the suppression hearing." *Moats v. State*, 455 Md. 682, 694, 168 A.3d 952 (2017). "We review the evidence and the inferences drawn therefrom in the light most favorable to the prevailing party." *Thornton v. State*, 465 Md. 122, 139, 214 A.3d 34 (2019). As a "mixed question of law and fact[,]" we accept "the hearing court's finding of fact unless they are clearly erroneous" but "review the hearing judge's legal conclusions *de novo*[.]" *Id.* (citations omitted). Thus, we independently evaluate without deference to the circuit court whether a police officer's conduct violated the constitutional rights of the defendant. *Sizer v. State*, 456 Md. 350, 362, 174 A.3d 326 (2017).

*Brown v. State*, 261 Md. App. 83, 92 (2024) (alterations in original) (quoting *Rodriguez v. State*, 258 Md. App. 104, 114-15 (2023)).

8

## DISCUSSION

## I.

## Motion to Suppress Evidence Found in the Vehicle

Appellant contends that the court erred in denying the motion to suppress the evidence found in his vehicle. He makes three contentions in this regard.

First, he argues that Trooper Yarbrough did not have probable cause to stop his vehicle because crossing the gore line "did not create a dangerous situation," and therefore, it did not "give Trooper Yarbrough probable cause to stop his vehicle." Second, appellant argues that the evidence was "obtained as a result of a pretextual stop [and] should be suppressed under the Maryland Declaration of Rights." Third, appellant asserts that Trooper Yarbrough lacked probable cause to search his vehicle because Md. Code Ann., Crim. Proc. ("CP") § 1-211 (2024 Supp.), prohibits law enforcement from stopping and searching a vehicle based on the smell of cannabis. Although the search here occurred prior to the effective date of the statute, he argues that the court erred in failing to apply it because (1) it was in effect prior to the date of his suppression hearing; and (2) the statute should be applied retroactively because it is a remedial statute and established a procedural change in the law.

The State contends that the circuit court properly denied the motion to suppress the evidence found in appellant's vehicle. It asserts that the stop was "justified by the traffic infraction." It argues that, even if the vehicle stop was pretextual, appellant's "claim under Article 26 is foreclosed as a matter of law" because Article 26 is construed *in pari materia* with the Fourth Amendment and is not subject to the exclusionary rule. The State argues

9

that the court properly rejected appellant's claim that CP § 1-211 precluded the search, noting that this Court held that the statute does not apply retroactively to searches that occurred before July 1, 2023.

## A.

### Reasonableness of the Initial Stop

The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, protects against "unreasonable searches and seizures." U.S. Const. amend IV; *Spell v. State*, 239 Md. App. 495, 507 (2018), *cert. denied*, 462 Md. 581 (2019). "A police-initiated traffic stop constitutes a seizure within the confines of the Fourth Amendment." *Spell*, 239 Md. App at 507 (quoting *Smith v. State*, 214 Md. App. 195, 201 (2013)). A traffic stop is reasonable under the Fourth Amendment if it is based on "reasonable articulable suspicion to believe that the [vehicle] [was] being driven contrary to the laws governing the operation of motor vehicles." *Smith*, 214 Md. App. at 201 (some alterations in original) (quoting *Lewis v. State*, 398 Md. 349, 362 (2007)), *cert. denied*, 436 Md. 330 (2013). Reasonable suspicion "exists somewhere between unparticularized suspicions and probable cause" and is based on an objective standard. *Sizer v. State*, 456 Md. 350, 364 (2017). Accordingly, to effectuate a stop predicated on a traffic violation under the Fourth Amendment, the State must establish that an officer had reasonable suspicion of an actual violation of the Maryland Vehicle Laws. *State v. Williams*, 401 Md. 676, 690 (2007). *Accord Steck v. State*, 239 Md. App. 440, 454 (2018), *cert. denied*, 462 Md. 582 (2019) (standard satisfied if police witness a violation of a traffic law).

10

Here, Trooper Yarbrough observed appellant cross the "gore area," a triangular area bounded by solid white lines, which constitutes a traffic control device. *See* Md. Code Ann., Transp. ("TR") § 11-167(2) (2020 Repl. Vol.) (a "[t]raffic control device" includes "any sign, signal, marking, or device that . . . [i]s placed by authority of an authorized public body or official to regulate, warn, or guide traffic"); *Stephens v. State*, 198 Md. App. 551, 561 (2011) ("[T]he lane designation marks on a roadway . . . are 'markings,' and therefore, 'traffic control devices' under T[R] § 11-167."). Appellant's crossing of the solid white line constituted a violation of TR § 21-201(a)(1), which provides: "the driver of any vehicle, unless otherwise directed by a police officer, shall obey the instructions of any traffic control device applicable to the vehicle and placed in accordance with the Maryland Vehicle Law." *See Stephens*, 198 Md. App. at 561 ("[F]ailure to obey [lane designation] markings, *i.e.*, traffic control devices, [is] a violation of T[R] § 21-201(a).").

Appellant contends, however, that Trooper Yarbrough did not have reasonable suspicion that he violated a Maryland Vehicle Law when he crossed over the gore area, relying on *Rowe v. State*, 363 Md. 424 (2001). In that case, the Supreme Court of Maryland held that the defendant's "momentary crossing of the edge line of the roadway and later touching of that line did not amount to an unsafe lane change" and did not provide reasonable suspicion to support the traffic stop. *Id.* at 441. Appellant asserts that, because his alleged traffic violation did not create a dangerous situation, Trooper Yarbrough did not have reasonable suspicion to pull him over. In support, he cites to testimony that traffic was moving at a very slow speed during rush hour, and his crossing of the gore line did not cause any vehicles to swerve, slam on their brakes, or nearly collide with him.

11

As appellant and the State note, we have distinguished *Rowe* in cases where vehicles unlawfully cross into another lane of traffic. *See Blasi v. State*, 167 Md. App. 483, 499 (crossing white line into other lane was unsafe and justified traffic stop), *cert. denied*, 393 Md. 245 (2006); *Dowdy v. State,* 144 Md. App. 325, 330-31 (2002) (probable cause to stop vehicle that twice crossed unlawfully into passing lane because doing so created a "potential danger to anyone who may have been proceeding lawfully in th[at] . . . lane"); *Edwards v. State*, 143 Md. App. 155, 168-69 (2002) ("[C]rossing the line into an oncoming lane of traffic is inherently dangerous, and qualitatively different from the situation in *Rowe*.").

In these cases, the defendant was charged with crossing a line in a manner that was unsafe pursuant to TR § 21-309. *Rowe*, 363 Md. at 441; *Blasi*, 167 Md. App. at 488; *Dowdy*, 144 Md. App. at 328. Here, however, appellant was charged with failing to obey a traffic control device in violation of TR § 21-201(a)(1), which does not include a safety component.

Nevertheless, the circuit court here made a factual finding that crossing the gore area was "somewhat dangerous." Thus, even if there needed to be a showing of a dangerous situation, the record supports the conclusion that improperly merging across a prohibited area poses a potential danger to nearby drivers who may not anticipate that approaching vehicles would illegally cross the white line. *See Blasi*, 167 Md. App. at 498 (comparing vehicle crossing on shoulder, which poses little to no danger of collision, with crossing into another lane of traffic).

Trooper Yarbrough's stop was supported by reasonable suspicion to believe that appellant had committed a traffic violation. The court properly found that the stop was reasonable under the Fourth Amendment.

**B.**

**The Maryland Declaration of Rights**

Appellant contends that the traffic stop here was pretextual, and the evidence obtained as a result "should be suppressed under the Maryland Declaration of Rights." He acknowledges that the United States Supreme Court held in *Whren v. United States*, 517 U.S. 806 (1996), that pretextual stops are permitted under the Fourth Amendment.[8] He asserts, however, that pretextual stops "promote excessive and discriminatory policing," and he argues that we should find such stops invalid under Article 26 of the Maryland Declaration of Rights.

The State contends that, even if appellant was subject to a pretextual stop, his "claim under Article 26 is foreclosed as a matter of law." It asserts that the Supreme Court of Maryland has "consistently required Article 26 to be construed in lockstep with the Fourth Amendment," and it has also recognized that there is no exclusionary rule for violations of

---

[8] The Fourth Amendment, U.S. Const. amend. IV, provides, as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article 26. It asserts that, in light of that caselaw, "this Court is without authority to afford [appellant] the relief he requests."

A pretextual stop, or a *Whren* stop, is a traffic stop "undertaken for the primary purpose of investigating other illegal activity." *Carter v. State*, 236 Md. App. 456, 468, *cert. denied*, 460 Md. 9 (2018). *Accord Thanner v. State*, 93 Md. App. 134, 137-38 (1992). Under *Whren*, a "law enforcement officer who observes a traffic violation may stop the violator, even though the officer does so out of curiosity as to whether (or in the hope that) the stop will lead to the discovery of other incriminating evidence." *Pryor v. State*, 122 Md. App. 671, 679 (1998). Maryland courts have repeatedly upheld these "valid but pretextual stops" as a "powerful law enforcement weapon." *Carter*, 236 Md. App. at 468 (quoting *Charity v. State*, 132 Md. App 598, 601 (2000)). *Accord Scott v. State*, 247 Md. App. 114, 151 (2020).

Here, the circuit court found that the stop was not pretextual, but even if it was, there was not a basis to address pretextual stops under Article 26 of the Maryland Declaration of Rights differently from the Fourth Amendment.[9] The State does not address whether the

---

[9] Article 26 provides, as follows:

> That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Md. Const. Declaration of Rts. art. 26. "Although Article 26 does not expressly prohibit unreasonable searches and seizures, we have interpreted it to do so." *Washington v. State*, 482 Md. 395, 408 n.1 (2022).

14

stop here was a pretextual stop, but it argues that, even if it was, appellant cannot claim relief. As explained below, we agree with the State that, even if the stop was a pretextual stop, appellant is not entitled to relief under the Maryland Declaration of Rights.

The Supreme Court of Maryland has consistently construed Article 26 of the Maryland Declaration of Rights *in pari materia* with the Fourth Amendment. *Washington v. State*, 482 Md. 395, 408 (2022). As the Court explained:

> [W]e interpret Article 26 *in pari materia* with the Fourth Amendment, meaning that the protections under Article 26 are coextensive with those under the Fourth Amendment. *See, e.g.*, *Whittington v. State*, 474 Md. 1, 23 n.17, 252 A.3d 529, 542 n.17 (2021); *King v. State*, 434 Md. 472, 482, 76 A.3d 1035, 1041 (2013); *Fitzgerald v. State*, 384 Md. 484, 506, 864 A.2d 1006, 1019 (2004). As we stated nearly a decade ago, "[a]lthough we have asserted that Article 26 may have a meaning independent of the Fourth Amendment, we have not held, to date, that it provides greater protection against state searches than its federal kin. Rather, we rejected uniformly such assertions." *King*, 434 Md. at 483, 76 A.3d at 1041 (citations omitted).

*Id.* at 454-55 (some alterations in original) (footnote omitted). In *Washington*, the Court "affirmed the continued validity of the construction of Article 26 *in pari materia* with the Fourth Amendment," and it held that the stop of Washington, based on Washington's unprovoked headlong flight, as well as other evasive conduct in a high-crime area, did not violate his rights under the Fourth Amendment or Article 26. *Id.* at 455-56.

To be sure, as appellant notes, the Supreme Court of Maryland has interpreted other articles of the Declaration of Rights as providing greater protection than those of the comparable federal constitutional provisions. *See, e.g.*, *Clark v. State*, 485 Md. 674, 717-18 (2023) (right to counsel under Articles 21 and 24 is broader than the right to counsel under the Sixth Amendment); *Marshall v. State*, 415 Md. 248, 259-60 (2010) (Article 22,

15

Maryland's privilege against self-incrimination is "more comprehensive than" the self-incrimination clause of the Fifth Amendment) (quoting *Crosby v. State*, 366 Md. 518, 527 n.8 (2001)).  As the Court explained in *Washington*, 482 Md. at 454-55, 454 n.14, however, the justification for departure from its "historical stance that the State and federal provisions were to be read *in pari materia*" does not carry over to the context of the Fourth Amendment and Article 26.

Moreover, even if there was a reason to depart from the well-established practice of construing Article 26 consistent with the Fourth Amendment, appellant would not be entitled to relief.  As the Court in *Washington*, 482 Md. at 455, explained:

> "[N]ever have we concluded explicitly and with clarity that an exclusionary rule, permitting the suppression of [ ] evidence as a remedy for an alleged Article 26 violation, exists under our state constitutional law."  [*King*, 434 Md.] at 483, 76 A.3d at 1042 (citations omitted).  In *King*, *id.* at 484, 76 A.3d at 1042, we pointed out that granting the defendant "the relief he [sought] under Article 26 would require both a departure from our traditional interpretation of the bounds of Article 26, as well as the adoption of a state law-based exclusionary rule." We declined to do so and reiterated that, "in construing Article 26, decisions of the Supreme Court are entitled to great respect."  *Id.* at 484, 76 A.3d at 1042 (cleaned up).

(some alterations in original). *Accord Padilla v. State*, 180 Md. App. 210, 219, *cert. denied*, 405 Md. 507 (2008).  Based on this caselaw, appellant states no claim for relief in this regard.

## C.

### Probable Cause to Search Vehicle

Appellant contends that, pursuant to the recently enacted CP § 1-211, Trooper Yarbrough did not have probable cause to search his car based on the smell of marijuana.

16

The State disagrees, arguing that "CP § 1-211 only applies to searches that occurred after the statute's effective date."

CP § 1-211 provides, as follows:

**Prohibited search of a vehicle or a person.**

(a) A law enforcement officer may not initiate a stop or a search of a person, a motor vehicle, or a vessel based solely on one or more of the following:
(1) the odor of burnt or unburnt cannabis;
(2) the possession or suspicion of possession of cannabis that does not exceed the personal use amount, as defined under § 5-601 of the Criminal Law Article; or
(3) the presence of cash or currency in proximity to cannabis without other indicia of an intent to distribute.

(b) If a law enforcement officer is investigating a person solely for driving or attempting to drive a motor vehicle or vessel while impaired by or under the influence of cannabis in violation of § 21-902 of the Transportation Article or § 8-738 of the Natural Resources Article, the law enforcement officer may not conduct a search of an area of a motor vehicle or vessel that is not:
(1)     readily accessible to the driver or operator of the motor vehicle or vessel; or
(2)     reasonably likely to contain evidence relevant to the condition of the driver or operator of the motor vehicle or vessel.

(c) Evidence discovered or obtained in violation of this section, including evidence discovered or obtained with consent, is not admissible in a trial, a hearing, or any other proceeding.

The effective date of this statute, July 1, 2023, was after the search of appellant's vehicle in September 2022, but before the suppression hearing on July 27, 2023. Appellant argues that the statute should apply in his case because "it took effect before his conviction and sentencing." This Court, however, has rejected the argument that CP § 1-211 should apply retroactively to searches conducted prior to July 1, 2023, the effective date of the

17

statute.  *Kelly v. State*, 262 Md. App. 295, 311 (2024); *Cutchember v. State*, 265 Md. App. 690, 693 (2025).

In *Kelly*, 262 Md. App. at 304-05, this Court gave a history of changes to cannabis law in Maryland, as follows:

> In 2014, the Maryland General Assembly enacted a law making the possession of less than ten grams of cannabis a civil offense. *Lewis v. State*, 470 Md. 1, 9, 233 A.3d 86 (2020). Despite that change, the Supreme Court of Maryland consistently held that the odor of cannabis remained evidence of a crime and permitted a warrantless search of a vehicle. *E.g.*, *In re D.D.*, 479 Md. 206, 277 A.3d 949 (2022); *Pacheco v. State*, 465 Md. 311, 214 A.3d 505 (2019); *Robinson v. State*, 451 Md. 94, 152 A.3d 661 (2017).
>
> In 2022, Maryland voters approved of a constitutional amendment that permitted, as of July 1, 2023, the use and possession of cannabis by an individual in the State who is at least twenty-one years old. Md. Const., art. XX, § 1 (effective December 14, 2022). That same year, the General Assembly overhauled Maryland's cannabis laws in light of the new constitutional amendment. 2022 Md. Laws, ch. 26. Under the new laws, the use and possession of a certain quantity of cannabis (the "personal use amount") would be legal for individuals who were at least twenty-one years old. *Id.* Possession of more than the personal use amount but less than a certain quantity (the "civil use amount") would be a civil offense and result in a fine. *Id.* Possession of more than the civil use amount was a crime punishable by imprisonment and/or a fine. *Id.* Those changes were to take effect on July 1, 2023. *Id.*
>
> The following year, during the 2023 legislative session, the General Assembly enacted CP § 1-211, which, as noted, also became effective July 1, 2023. Acts of 2023, ch. 802, § 2.  That law states, in pertinent part, that "[a] law enforcement officer may not initiate a stop or a search of a person, a motor vehicle, or a vessel based solely on ... the odor of burnt or unburnt cannabis[.]"  CP § 1-211(a)(1).  The law states further that "[e]vidence discovered or obtained in violation of this section, including evidence discovered or obtained with consent, is not admissible in a trial, a hearing, or any other proceeding."  CP § 1-211(c).

(Alterations in original) (footnote omitted).

In that case, CP § 1-211(c) became effective after Kelly's trial, while his appeal was pending. *Id.* at 301. In addressing whether the statute applied retroactively, we stated that "[t]he question whether a statute operates retrospectively, or prospectively only, ordinarily is one of legislative intent." *Id.* at 303 (quoting *State v. Smith*, 443 Md. 572, 588 (2015)). We noted that statutes are "presumed to operate prospectively . . . absent manifest legislative intent to the contrary." *Id.* (quoting *Graves v. State*, 215 Md. App. 339, 350 (2013)). Nevertheless, there are exceptions to that presumption. *Id.* Statutes that are procedural and do not impair existing substantive rights may be applied retroactively, unless a contrary intent is expressed. *See id.* Similarly, a remedial statute, one that provides a remedy, improves an existing remedy, or is "'designed to correct existing law' or . . . 'defects, mistakes[,] and omissions in the civil institutions and the administration of the [S]tate,'" can be applied retroactively. *Id.* at 304 (some alterations in original) (quoting *Est. of Zimmerman v. Blatter*, 458 Md. 698, 729 (2018)).

Another exception to the presumption that statutes apply prospectively involves statutes affecting matters still in litigation. *Id.* In *In re M.P.*, 487 Md. 53, 86 (2024), the Supreme Court of Maryland recognized that "a statute that affects a matter still in litigation will be applied by a reviewing court even though the statute was not law when the lower court decision was handed down." *Kelly*, 262 Md. App. at 304. We noted in *Kelly*, however, that "[a]n important caveat to each of these exceptions is that they cannot be applied *if the General Assembly expresses a contrary intent*." *Id.* (emphasis added).

19

Analyzing the plain language of CP § 1-211 to determine the legislative intent, we determined in *Kelly* that the General Assembly did not intend CP § 1-211 to be applied retroactively, stating that:

> CP § 1-211 has two relevant prongs: a "right" prong, namely, that a law enforcement officer may not initiate a search of a vehicle based solely on the odor of burnt or unburnt cannabis; and a "remedy" prong, namely, that "[e]vidence discovered or obtained *in violation of this section*" is inadmissible. CP § 1-211(a), (c) (emphasis added). By structuring the statute in such a manner, the Maryland General Assembly clearly indicated that, for a defendant to avail himself of the "remedy" of exclusion, the evidence at issue must have been discovered in violation of the "right" established by the statute. Clearly, that "right" did not exist before the statute became effective.
>
> ***
>
> Importantly, because the exclusionary remedy provided by CP § 1-211 was made contingent upon a violation of the right created by the statute, the General Assembly sent a clear message that the statute was not merely procedural or remedial, but rather was a substantive change to existing rights, as well as the duties and obligations of law enforcement officers. Consequently, CP § 1-211 cannot, and should not, be applied retroactively to the search at issue in the instant case.

*Id.* at 308-09 (alteration in original).

We also addressed the relevant legislative history of CP § 1-211, which showed that the "right" prong, CP § 1-211(a), was intended, in part, "to address racial disparities arising from stops and seizures based on the odor of cannabis." *Id.* at 311. The remedy prong, CP § 1-211(c), by contrast, "was intended to deter law enforcement officers from violating the 'rights' portion of the enactment," and the "very notion of determent of future misconduct is not served by retroactive application of an exclusionary rule." *Id.*

Appellant argues that our holding in *Kelly* should not apply here because the "procedural posture of *Kelly* was central" to the decision, and the procedural posture of this

20

case is different. In *Kelly*, the statute did not go into effect until after Kelly was convicted and sentenced. *Id.* at 300-01. Here, by contrast, the law was in effect at the time of the suppression hearing.

We recently addressed, and rejected, a similar argument in *Cutchember*, 265 Md. App. at 693. In that case, the defendant's vehicle was subject to a warrantless search, based on the detection of cannabis odor, prior to the enactment of CP § 1-211, but, as in this case, the hearing on defendant's motion to suppress was held after CP § 1-211(c) went into effect. *Id.* at 693, 699. Cutchember argued, as does appellant, that the difference in the procedural posture was "critical." *Id.* at 699. We agreed with the State, however, that the difference in the procedural posture of the cases was "a distinction without a difference." *Id.*

We explained that the "right" involved was "the right to be free of a search by a law enforcement officer based solely on the odor of burnt or unburnt cannabis." *Id.* at 701. We stated that it "logically follows that the date of the search is the key event in determining whether the right created by the statute in fact existed and thus whether a violation of that right had occurred." *Id.* Accordingly, we held that, "because the search in the instant case occurred before the effective date of CP § 1-211, the remedy of 'exclusion' under CP § 1-211(c) does not apply." *Id.*

We explained:

CP § 1-211(a) created a statutory right not heretofore recognized in Maryland law, to wit, a prohibition against searches of motor vehicles based solely on the odor of cannabis. CP § 1-211(c) provided a remedy of exclusion of evidence expressly contingent upon a violation of the right created by the statute. Because a search cannot violate a nonexistent statutory right, the

21

exclusionary remedy of CP § 1-211(c) cannot apply to a search that took place before the statute's effective date of July 1, 2023.

*Id.* at 706.

Accordingly, because the search of appellant's vehicle occurred on September 14, 2022, prior to the statute's effective date of July 1, 2023, CP § 1-211(c) does not apply to the search here. The circuit court did not err in denying appellant's motion to suppress the evidence found during the search of the car.

## II.

### Motion to Suppress Statements

Appellant next contends that the court erred in denying his motion to suppress his statements claiming ownership of the gun and the backpack.[10] He asserts that, at the time he made these statements, he was "subject to the equivalent of a custodial arrest," and Trooper Yarbrough was required to give him *Miranda* warnings before asking who owned the gun discovered in the vehicle. He argues that, "[b]ecause officers failed to do so, the court erred in denying the motion to suppress [his] un-*Mirandized* statements."

The State contends that the court properly denied appellant's motion to suppress his statement that the gun and backpack belonged to him because appellant was not in custody at the time. It asserts that the protections of *Miranda* apply only when a person is subject to custodial interrogation, and appellant was not in custody when he made the statements.

---

[10] As indicated, the circuit court found that, after appellant admitted that the gun was his, he was in custody, and it granted the motion to suppress the statements he made after that. The body-worn video shows that appellant said that the backpack was his after he admitted that the gun was his.

22

The State asserts that a reasonable person in appellant's position "would not have felt restrained to the degree associated with a formal arrest."

## A.

### Custody for Purposes of Miranda

The Fifth Amendment to the United States Constitution, which is applicable to the States through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V; *Moody v. State*, 209 Md. App. 366, 379 (2013).  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court adopted procedural safeguards to protect a suspect from the "inherently compelling pressures" of custodial interrogation.  *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (quoting *Miranda*, 384 U.S. at 467).  *Miranda* requires law enforcement to inform an individual in custody of several rights before questioning begins, including "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  384 U.S. at 444.  *Accord Madrid v. State*, 474 Md. 273, 309-10 (2021).

It is undisputed that Trooper Yarbrough did not give appellant his *Miranda* rights. It is clear, however, that "police officers are not required to administer *Miranda* warnings to everyone whom they question."  *Abeokuto v. State*, 391 Md. 289, 333 (2006) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).  As the Supreme Court has explained, "admissions of guilt by wrongdoers, if not coerced, are inherently desirable…. Absent some officially coerced self-accusation, the Fifth Amendment privilege is not

23

violated by even the most damning admissions." *Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (alteration in original) (quoting *United States v. Washington*, 431 U.S. 181, 187 (1977)).

Nevertheless, in *Miranda*, the Court announced a bright line rule "that *the combination of custody and interrogation will be deemed to be presumptively coercive*." *Smith v. State*, 186 Md. App. 498, 517 (2009) (quoting *Reynolds v. State*, 88 Md. App. 197, 209 (1991)). This prophylactic rule "sweep[s] beyond the actual protections of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 639 (2004). Under *Miranda*, custodial interrogation "*gives rise to the presumption of compulsion*." *Smith*, 186 Md. App. at 517 (quoting *Reynolds*, 88 Md. App. at 209).

For *Miranda* warnings to be required, the defendant must establish two things: (1) custody; and (2) interrogation. *Reynolds v. State*, 461 Md. 159, 177-78 (2018), *cert. denied*, 586 U.S. 1076 (2019). The defendant bears the burden to show that he or she was in custody and subject to an interrogation. *Moody*, 209 Md. App. at 380.

Here, the circuit court determined, and the parties agree, that Trooper Yarbrough interrogated appellant when he asked questions regarding the gun and the backpack. The question is whether appellant was in custody.

Whether a defendant was in custody during police interrogation is a legal question. *See State v. Rucker*, 374 Md. 199, 207 (2003) ("In determining whether there was custody for purposes of *Miranda*, we accept the trial court's findings of fact unless clearly erroneous. . . . [We] make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody.") (quoting

24

*McAvoy v. State*, 314 Md. 509, 514-15 (1989)). "A determination of whether an individual

is in *Miranda* custody is an objective inquiry based on the totality of the circumstances."

*Brown v. State*, 452 Md. 196, 210 (2017).

In addressing whether there was custody, our initial inquiry is "whether a reasonable

person would have thought he was free to leave the police encounter." *Moody*, 209 Md.

App. at 382. A non-exhaustive list of factors relevant to the issue of custody includes:

> [W]hen and where [the encounter] occurred, how long it lasted, how many
> police were present, what the officers and the defendant said and did, the
> presence of actual physical restraint on the defendant or things equivalent to
> actual restraint such as drawn weapons or a guard stationed at the door, and
> whether the defendant was being questioned as a suspect or as a witness.

*Thomas v. State*, 429 Md. 246, 260 (2012) (quoting *Owens v. State*, 399 Md. 388, 429

(2007)).[11]

Here, appellant was detained for a traffic stop, and a reasonable person would not

have felt free to leave until the stop concluded. *Pyon v. State*, 222 Md. App. 412, 453

(2015) ("[F]ew motorists would feel free either to disobey a directive to pull over or to

leave the scene of a traffic stop without being told they might do so.") (emphasis omitted)

---

[11] Other factors that may be relevant to the analysis include:

> [H]ow the defendant got to the place of questioning whether he came
> completely on his own, in response to a police request or escorted by
> police officers. Finally, what happened after the interrogation whether
> the defendant left freely, was detained or arrested may assist the court
> in determining whether the defendant, as a reasonable person, would
> have felt free to break off the questioning.

*Thomas v. State*, 429 Md. 246, 260-61 (2012) (quoting *Owens v. State*, 399 Md. 388, 429
(2007)).

25

(quoting *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984)).  A determination that an individual's freedom of movement was curtailed, however, is merely the first step in the analysis.  "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*."  *Howes v. Fields*, 565 U.S. 499, 509 (2012).  *Accord Smith*, 186 Md. App. at 535 ("That a detainee may not feel 'free to leave,' moreover, is not a talisman for determining *Miranda*'s applicability.").  To determine the issue of custody, the ultimate inquiry is whether there is a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

**B.**

**Traffic/*Terry* Stops**

In *Berkemer*, 468 U.S. at 422-23, the United States Supreme Court considered whether an individual detained during a lawful traffic stop is "in custody" for purposes of *Miranda*.  The question in that regard was "whether a traffic stop exerts upon a *detained* person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights."  *Id*. at 437 (emphasis added).

The Court noted that two features of a typical traffic stop "mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" *Id.* (quoting *Miranda*, 384 U.S. at 467).  It explained:

> First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief.  The vast majority of roadside detentions last only a few minutes.  A motorist's expectations, when he sees a policeman's light

26

flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.

*Id.* at 437-38.

The Court went on to note that, although a motorist stopped by the police may feel some anxiety, the encounter generally is not coercive because it is not conducted in a "police dominated atmosphere." *Id.* at 438-39.

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself, and in the subsequent cases in which we have applied *Miranda*.

*Id.* (footnotes omitted) (citations omitted).

27

The Court stated that "the usual traffic stop is more analogous to a so-called '*Terry* stop,' see *Terry v. Ohio*, 392 U.S. 1, . . . (1968), than to a formal arrest." *Id.* at 439.[12] It noted that, due to the "comparatively nonthreatening character" of *Terry* stops, the Court had not issued any opinions holding that such stops were "subject to the dictates of *Miranda*." *Id.* at 440. The Court held that, given the "noncoercive aspect of ordinary traffic stops," individuals "temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id.* It explained that *Miranda* warnings are not required in the context of traffic stops unless the person detained "thereafter is subjected to treatment that renders him 'in custody' for practical purposes." *Id.*

The Court found that Berkemer had not demonstrated that he was subject to restraints comparable to an arrest after he was stopped for a traffic violation. *Id.* at 441. It noted that "[o]nly a short period of time elapsed between the stop and the arrest," Berkemer was not told that his detention would not be temporary, and "a single police officer asked [him] a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists." *Id.* at 441-42. Under these circumstances, Berkemer was not in custody for purposes of *Miranda*. *Id.* at 442.

After *Berkemer*, this Court and the Supreme Court of Maryland have held that a brief investigatory stop usually does not implicate *Miranda*. *See Rucker*, 374 Md. at 212; *Rodriguez*, 258 Md. App. at 130-31. In *Rucker*, 374 Md. at 202-03, the police, based on a

---

[12] A *Terry* stop "involves a more temporary detention, designed to last only until a preliminary investigation either generates probable cause [to arrest] or results in the release of the suspect." *Drake v. United States*, 315 A.3d 1196, 1204 (D.C. 2024); *see Terry v. Ohio*, 392 U.S. 1 (1968).

tip that Rucker was involved in narcotics trafficking, stopped Rucker in a shopping center parking lot during the early evening hours, asked for his license and registration, and asked whether "he had anything he was not supposed to have." Rucker admitted to having cocaine. *Id.* at 203. In holding that this brief investigatory detention was not custodial for purposes of *Miranda,* the Court noted that the detention was brief, lasting less than one hour, and Rucker "was not isolated in a police-dominated atmosphere when he was questioned by police." *Id.* at 220-21. It noted that, although there were three officers on the scene, one stepped away as the other two approached the defendant, and only one officer asked the defendant a single question before the defendant admitted having illegal drugs. *Id.* at 221. "Rucker was not handcuffed or actually physically restrained until after he admitted to having cocaine." *Id.* The Court found that Rucker's detention was more like a routine traffic stop than an arrest, and he was not "'subjected to treatment that render[ed] him "in custody" for practical purposes,' which would have 'entitled him to the full panoply of protections prescribed by *Miranda.*'" *Id.* at 221 (alteration in original) (quoting *Berkemer*, 468 U.S. at 440).

## C.

### Factors Weighing Against a Finding of Custody

Several factors weigh in favor of a finding that appellant was subject to a traffic/*Terry* stop and was not in custody before he said that the gun was his. When Trooper Yarbrough stopped appellant for a traffic violation, he explained the reason for the stop, asked for appellant's license and registration, and told appellant to "hang tight" so Trooper Yarbrough could get him "out of here." Although the encounter transformed into an

29

investigatory stop once Trooper Yarbrough smelled the odor of marijuana, asked the occupants to get out of the car, and searched the car, Trooper Yarbrough did not say anything at that time to suggest that the stop was not still temporary. The encounter occurred in a neutral, public place, during daylight hours. *See United States v. Jones*, 187 F.3d 210, 218 (1st Cir. 1999) ("[A] public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse."). The encounter was brief, and it was "relatively calm and nonthreatening." *See United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011) (suspect was not in custody where atmosphere was "relatively calm and nonthreatening").[13] Three officers were present, but only one officer questioned appellant, and he asked only one question, after which appellant immediately stated that the gun was his. These factors weigh in favor of the circuit court's finding that this was a noncoercive investigatory stop that did not amount to custody to require *Miranda* warnings.

## D.

## Handcuffs

There is an additional factor here, however, that gives us pause in the custody analysis. That factor is the use of physical restraint, i.e., the order to place appellant in

---

[13] The body camera video indicates that the entire encounter, from the initial stop to the statement that the gun was appellant's gun, was approximately 15 minutes. Approximately five minutes involved the officer getting documentation from appellant and the other driver and issuing the warning to the other driver. Trooper Yarbrough then spent another five minutes back in his patrol car entering information into his computer. The time from when he returned to appellant's vehicle and advised that he smelled marijuana to the time appellant stated that the gun was his was less than five minutes.

handcuffs.  Some courts give the fact that the police handcuffed a suspect significant weight in the custody analysis.  *See, e.g.*, *Sanders v. United States*, 330 A.3d 1013, 1024 (D.C. 2025) (placing a suspect in handcuffs "strongly militates toward a finding of *Miranda* custody") (quoting *Morton v. United States*, 125 A.3d 683, 689 (D.C. 2015)); *United States v. Palmer*, 111 F.4th 588, 595 (5th Cir. 2024) ("Handcuffing generally weighs in favor of a finding of custody.").

Nevertheless, it is clear that the use of handcuffs is not dispositive regarding the issue of custody.  *See People v. Cabrera*, 230 N.E.3d 1082, 1094-95 (N.Y. 2023) (use of handcuffs must be given substantial weight, but it is not dispositive as "custodial status analysis is inherently fact-specific"); *Sanders*, 330 A.3d at 1024 (use of handcuffs is not dispositive in the *Miranda* analysis).  Indeed, this Court, as well as multiple other courts, have made clear that handcuffing a suspect does not necessarily elevate a lawful stop into a custodial arrest that implicates *Miranda*.  *See Smith*, 186 Md. App. at 535 (handcuffing a person during detention "is not *ipso facto* custody within the contemplation of *Miranda*"); *United States v. Fornia-Castillo*, 408 F.3d 52, 64-65 (1st Cir. 2005) (suspect not in custody for purposes of *Miranda* when officer handcuffed him on a busy, public road for only ten or fifteen minutes until other officers arrived); *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."); *United States v. Bautista*, 684 F.2d 1286, 1292 (9th Cir. 1982) (alteration in original) ("Handcuffing a suspect does not necessarily dictate a finding of custody. . . . Strong but reasonable measures to insure the

31

safety of the officer or the public can be taken without necessarily compelling a finding that the suspect was in custody.") (quoting *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981)), *cert. denied*, 459 U.S. 1211 (1983).

Appellant argues that the order to place him in handcuffs here weighs in favor of a finding that he was in custody. In support, he notes that, in *Longshore v. State*, 399 Md. 486, 502 (2007), the Supreme Court of Maryland held that "generally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest." As the circuit court noted, however, citing *In re David S.*, 367 Md. 523, 536 (2002) and *Trott v. State*, 138 Md. App. 89, 118 (2001), under a Fourth Amendment analysis, the use of handcuffs does not turn a *Terry* stop, requiring reasonable suspicion, into an arrest, requiring probable cause, if the handcuffs are used based on concerns for officer safety or flight. *Accord Chase v. State*, 449 Md. 283, 308-11 (2016) (placing a suspect in handcuffs does not transform a *Terry* stop into an arrest if there are officer safety concerns). The State similarly relies on the fact that the handcuffs were justified by officer safety concerns in support of its argument that appellant was not in custody.

There is language in cases that supports the circuit court's analysis that, when an investigatory stop is reasonable under the Fourth Amendment, a detained suspect is not "in custody" for purposes of *Miranda*. *See, e.g.*, *United States v. Leggette*, 57 F.4th 406, 411 (4th Cir. 2023) ("[A]n officer's actions that fall within the bounds of a lawful *Terry* stop do not create custody under *Miranda*."); *Rucker*, 374 Md. at 218 ("[B]rief, investigatory stops are not custodial for purposes of *Miranda*."). Nevertheless, the courts in these cases addressed the totality of the circumstances to determine whether police conduct after the

32

initial stop subjected the person to "treatment that render[ed] him in custody for practical purposes." *Rucker*, 374 Md. at 218-19 (quoting *Berkemer*, 468 U.S. at 440); *Leggette*, 57 F.4th at 411-12.

Other courts have explained that a Fourth Amendment reasonableness analysis is not the appropriate standard for assessing custody under the Fifth Amendment. As the District of Columbia Court of Appeals stated in *White v. United States*, 68 A.3d 271, 283-84 (2013):

> The central inquiry under the Fourth Amendment is whether the actions of the police were reasonable—*i.e.,* whether they were taken with adequate justification. But "whether the police's tactics were reasonable is not the preoccupation of the Fifth Amendment," *In re I.J.*, 906 A.2d [249,] 259 [(2006),] nor is it dispositive of the *Miranda* custody inquiry, which, as discussed above, turns on how the police's actions might reasonably be perceived and whether they might make an individual feel a degree of restraint associated with arrest. The fact that "an encounter may be a *reasonable* seizure within the scope of *Terry* for Fourth Amendment purposes does not automatically and necessarily remove it from *Miranda's* Fifth Amendment protections." *Id.* at 257; *see also In re D.W.*, 989 A.2d [196,] 201 [(2010)] (noting that "[i]t is clear ... that an individual may be in custody even when he has not been formally arrested").

The court stated that, "because the requisite analyses under the Fourth and Fifth Amendments are different, identifying a stop as permissible under *Terry* does not tell us whether an individual who has been stopped is subject to a detention that constitutes *Miranda* custody." *Id.* at 284. *Accord State v. Ortiz*, 346 S.W.3d 127, 133-34 (Tex. App. 2011) (collecting cases for the proposition that a finding that handcuffing a suspect was reasonable under the Fourth Amendment does not preclude a finding that the suspect was in custody under *Miranda*), *aff'd*, 382 S.W.3d 367 (Tex. Crim. App. 2012).

We agree that the issue of Fifth Amendment custody requires an analysis separate from whether conduct during a *Terry* stop was reasonable under the Fourth Amendment. As this Court recently stated, "brief, investigatory stops are *usually* not custodial for purposes of *Miranda*," but they are "subject as always to the totality of the circumstances analysis." *Rodriguez*, 258 Md. App. at 134 n.8. Accordingly, a conclusion that the use of handcuffs was reasonable under the Fourth Amendment based on officer safety is not dispositive in a Fifth Amendment custody analysis. For custody purposes under *Miranda*, police action in putting a suspect in handcuffs is one factor to be considered in the totality of the circumstances.

The State cites *United States v. Coulter*, 41 F.4th 451 (5th Cir. 2022), in support of its contention that the use of handcuffs here did not amount to custody under the totality of the circumstances. In that case, a police officer pulled Coulter over at approximately 2:45 a.m., after determining that the registration for the vehicle Coulter was driving was expired. *Id.* at 454. After the officer frisked Coulter, and in response to questioning, Coulter stated that he was on parole for aggravated robbery, and he had a gun in the vehicle. *Id.* The officer advised that he was "just going to detain" Coulter so he did not "run up and grab the gun." *Id.* He then handcuffed Coulter "for officer safety." *Id.* The officer reiterated that Coulter was "[j]ust detained," and Coulter said that the officer was "cool." *Id.*

The court noted that it had not yet "considered whether a suspect questioned while in handcuffs during a valid traffic stop is in *Miranda* custody." *Id.* at 460. It ultimately held, however, that the objective concerns for safety necessitated the precaution of handcuffing, and under the circumstances of the case, it did not render Coulter in custody.

34

*Id.* at 458, 460. The court noted that the location of the encounter, the street in front of Coulter's parents' home, did "not present the same inherently coercive pressures as the station house questioning at issue in *Miranda.*" *Id.* at 462-63. Moreover, "[u]nlike station house interrogations," the encounter lasted a short time, approximately 15 minutes. *Id.* The officer told Coulter multiple times that he was "just detained," and Coulter responded, "you're cool." *Id.* at 460. Under all of the circumstances, the court held that "a reasonable person in Coulter's position would not have equated the restraint on his freedom of movement with formal arrest," and he was not in custody for purposes of *Miranda*. *Id.* at 463.

The statement by the officer in that case, that the suspect was "just detained," is significant. Other courts have found similar statements to weigh in favor of a finding that a suspect is not in custody, despite being placed in handcuffs. *See United States v. Palmer*, 111 F.4th 588, 595 (5th Cir. 2024) (suspect in handcuffs was not in custody where officers' comments suggested that the suspect was not under arrest); *Commonwealth v. Vellucci*, 152 N.E.3d 792, 797 (Mass. App. Ct. 2020) (suspect not in custody where encounter occurred on a public street and suspect told he was being placed in handcuffs for safety reasons); *State v. Price*, 746 S.E.2d 258, 261 (Ga. Ct. App. 2013) (suspect not in custody when handcuffed after traffic stop where the officer told the suspect that he was being detained but was not under arrest).

One of the reasons that the court in *Berkemer* cited for holding that a traffic stop, like a *Terry* stop, generally did not constitute custody for *Miranda* purposes was because a reasonable person would understand that such a detention was likely to be "temporary and

35

brief." 468 U.S. at 437. Thus, a statement by the officer that handcuffs are being used solely for safety purposes would lead a reasonable person to understand that the handcuffs would be used only until the officer finished his or her investigation.

Although Trooper Yarbrough testified that he told appellant that he was being handcuffed for safety reasons, the officer's body camera video does not reflect that statement. The absence of such a statement, however, is not dispositive; it is merely one of the circumstances to consider. Courts have found no custody when a suspect is handcuffed during an investigatory stop when no such statements regarding the reason for the handcuffs are made. *See, e.g.*, *Fornia-Castillo*, 408 F.3d at 64-65 (suspect not in *Miranda* custody when an officer stopped the suspect on a busy public road, drew his gun, handcuffed the suspect for ten to fifteen minutes, frisked the suspect, and questioned him while handcuffed); *United States v. McCullers*, 591 F. Supp. 3d 38, 51-52 (E.D. Va. 2022) (where police conduct a *Terry* stop and asked a few questions within minutes of the stop, suspect was not in *Miranda* custody, even though the suspect was on the ground in handcuffs), *aff'd on other grounds*, *United States v. Brown*, 114 F.4th 253 (4th Cir. 2024).

**E.**

**Totality of Circumstances**

Here, in assessing the totality of the circumstances, we have noted that several factors weigh in favor of a conclusion that appellant was not in custody. The encounter was in a neutral, public place, during daylight, and it was brief. Although there were three officers present, only one asked any questions, and he asked only one question before appellant stated that it was his gun. The encounter was conducted in a respectful tone, and

36

when Trooper Yarbrough asked: "Whose gun," appellant responded immediately, before he was actually handcuffed, that it was his gun.[14]

Nevertheless, there are factors weighing in favor of a conclusion that appellant was in custody. As discussed, Trooper Yarbrough directed the other officers to handcuff appellant, and he did not tell appellant that he was not under arrest or otherwise indicate that the use of handcuffs would be temporary.

Another factor that weighs in favor of a finding of custody is that Trooper Yarbrough ordered appellant and the other occupants of the vehicle to be handcuffed after he had discovered marijuana and a handgun in a backpack behind the driver's side seat, in the vehicle that appellant had been driving. In *Argueta v. State*, 136 Md. App. 273, 303, *cert. denied*, 364 Md. 142 (2001), the police discovered a large, concealed knife on Argueta's person. This Court stated that, under these circumstances, it was "unlikely that any reasonable person would believe that the questioning would only continue for a brief period of time, and that the detention would soon cease." *Id.* We held that Argueta was in custody for purposes of *Miranda* because, under these circumstances, a "reasonable person in this situation would certainly believe that . . . the discovery of a [weapon] . . . would inevitably lead to an arrest." *Id.* As the State notes, in this case, the gun was not found on appellant's person, and Trooper Yarbrough asked all three occupants "whose gun," to "figure out" who it belonged to. That is a factual distinction, but Trooper Yarbrough's

---

[14] The record reflects that three seconds elapsed between Trooper Yarbrough telling the other officers to "cuff them," and appellant's statement that it was his gun.

37

order to "cuff them" after finding the drugs and a gun in the car weighs in favor of a finding of custody.

Under the totality of the circumstances, we conclude that appellant was in custody when he stated that the gun was his. The circuit court erred in finding to the contrary and in denying the motion to suppress appellant's statements that the gun belonged to him.

## III.

## CONCLUSION

In sum, we conclude that the circuit court properly denied the motion to suppress the evidence discovered in appellant's vehicle, but it erred in denying, in part, the motion to suppress statements made by appellant after discovery of the marijuana and weapon in the vehicle. Accordingly, we reverse appellant's conviction of transporting a handgun in a vehicle.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. COSTS TO BE PAID BY MONTGOMERY COUNTY.**